Amanda JOHNSON, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000365–MR.

Supreme Court of Kentucky.

April 25, 2013.

Rehearing Denied Aug. 29, 2013.

Susan Jackson Balliet, Assistant Public Advocate, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, James Hays Lawson, Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant Amanda Johnson was convicted in Laurel Circuit Court in May 2011 of the murder and first-degree criminal abuse of her two-year-old son, Stephen Carl Troy. Appellant appeals the trial court's judgment in its entirety, though two of her complaints relate only to her abuse conviction. As to the abuse conviction, she alleges that she was entitled to a directed verdict and, alternatively, that the jury's verdict violated the unanimity requirement. She also complains generally that the trial court committed palpable error regarding a police detective's trial testimony. While this Court concludes that the trial court did not err in denying Appellant's motion for a directed verdict, it does conclude that the jury's verdict in this case as to first-degree criminal abuse violated the unanimity requirement. Also, there was no reversible error in playing a recorded interview in which a police detective accused the Appellant of not telling the truth, nor in allowing that detective to

testify that Appellant's story was inconsistent with other testimony. This Court hereby affirms Appellant's murder conviction but reverses her abuse conviction.

## I. Background

October 16, 2009, according to Will Callahan, was the date on which he and Appellant first noticed a bruise on the small of her two-year-old son's back. They did not know where the bruise came from, but Appellant suggested that it might have been caused when Stephen fell off a chair.

On October 21, 2009, according to Appellant, Stephen threw a temper tantrum and fell from a seated position backwards onto the kitchen hardwood floor. After the fall, Appellant examined Stephen and noticed that the bruise on Stephen's back had gotten bigger. Later that day, Appellant took Stephen to visit Michael Troy, Stephen's father, who had custody of Stephen on Wednesdays and Thursdays.

During his visit, Michael noticed the bruise on Stephen's back, describing it as dark purple, almost black. That afternoon, Stephen was not walking and was "scooting" across the floor instead. Michael went to Cracker Barrel where Appellant worked and asked her about the bruise, which he said looked like someone had punched him. Appellant said that Stephen got the bruise from having a fit while Will was watching him.

The next day, October 22, 2009, Michael took Stephen to visit Appellant's father, Harry Johnson, who was also Michael's boss. Harry was not home when they arrived and Michael showed Harry's wife, Susie, the bruise. Susie called Harry home from work to look at the bruise, and he noticed that the bruise was large, but that it was a yellowish-brown color. Michael and Stephen ran a few errands and then Stephen was returned to Appellant's that night.

When Stephen got home, Will noticed small bruises on his abdomen and the bruise on his back as well, noting that it was "a darker color." Stephen was not himself on Thursday night and slept sitting up on the couch that night.

According to Will's testimony, at about 7:15 or 7:20 a.m. on Friday, October 23, 2009, he heard a loud thump followed by a blood curdling cry coming from the living room at the home he shared with Appellant and her son. When Will went to the living room to investigate what had happened, he found Appellant standing four or five feet from Stephen, who appeared to be injured and was whimpering like he had the breath knocked out of him. Will likened the sound that Stephen was making to "a scream kind of muzzled, like straining out."

Shortly after the incident, Amanda left for work and Stephen vomited and it had a terrible odor. Within five minutes he threw up a second time and immediately got extreme diarrhea. Will took Stephen to the bathtub, stripped him down and looked for any bruises. He noticed new stomach bruises and a bruise under his testicles, injuries he had not noticed before. Stephen began struggling to breathe. Will called Appellant at her work to tell her that he was going to call 911. When he hung up, Stephen's eyes rolled back in his head and he went limp. The ambulance arrived, but Stephen was pronounced dead at the hospital.

The medical examiner, Dr. John Hunsaker III, listed the cause of death as blunt force injury to the abdomen and hypovolemic shock due to internal loss of blood. Stephen's small bowel just below the stomach was completely torn and shredded by a blunt force that went two to three inches inward and compressed his small bowel against his spine. Stephen

also had a large bruise about the size of a grapefruit just above the small of his back. He lost half of his blood supply into his abdominal cavity.

Dr. Hunsaker concluded that the "acute" injury occurred over a short period of time, within two to forty-eight hours before death. He based his conclusion on evidence of inflammation at the site of the acute injury which indicated healing had started further back than one-and-a-half hours before the victim's death. Therefore, according to Dr. Hunsaker's time frame, the acute injury must have occurred between October 21, 2009, at 9:30 a.m. and October 23, 2009, at 7:30 a.m.

Dr. Emily Craig, a forensic pathologist, also conducted a post-mortem investigation into Stephen's lower extremities and discovered three distinct leg fractures, each of which, based on the extent of healing present, occurred at different times. The first occurred approximately two months prior to Stephen's death, the second occurred between five to seven weeks before his death, and the last fracture occurred approximately two weeks prior to death. Two of the fractures were indicative of abuse according to Dr. Craig.

Throughout Appellant's trial, a number of witnesses testified about how Stephen had trouble walking during the last few months of his life. There was also testimony that the Appellant had told many who asked about Stephen's trouble walking that she had already taken him to the hospital for treatment, though it was later discovered that she had never done so.

There was testimony from Appellant's family members, friends, and acquaintances suggesting that Stephen had been abused during the few months leading up to his death. For example, Appellant's father testified that, because he had noticed the bruise on Stephen's back, he did not want Michael Troy to take Stephen

back to Appellant's home until he had a chance to "talk to [Appellant and Will] to find out how that happened." Additionally, the Commonwealth played a taped phone conversation between Appellant and her father where she explained that she had not taken Stephen to the hospital for his injuries because she was "scared he might get taken away" and that "taking him to the [emergency room] over and over again would look bad."

Appellant's former neighbor Darlene McClure also testified that the day after Stephen's death people had gathered at her house. Darlene testified that she spoke with Appellant in her kitchen about what had happened the morning of Stephen's death and that if she knew what had happened to Stephen, "she need[ed] to tell someone." Darlene asked Appellant whether it was Michael or Michael's brother, Chris Troy, who had caused Stephen's death, and Appellant said "no." Instead, Appellant told Darlene that it was an accident and, when Darlene again said "you need to tell someone," Appellant responded "I just did." Darlene testified that Appellant "was real evil about it."

Will Callahan testified that he once saw Amanda curse Stephen and saw her throw him on the couch. He also testified that a few days before Stephen's death, he saw Appellant slap the child hard on the back, though not with a closed fist, when he asked to be picked up.

There was also evidence that Amanda and Michael had two children prior to having Stephen while they were living in Michigan. The couple lost custody of each of these children due to abuse in the household and the abuse resulted in convictions for both Appellant and Michael. During trial, the jury learned that Amanda was convicted in Michigan of misdemeanor child abuse, though Appellant contends

that the jury did not learn that her conviction was merely for passively allowing Michael Troy to commit abuse. The jury in this case did not learn that Appellant and Michael had lost custody of those children.

After three days of trial, the jury convicted Appellant of one count of wanton murder and one count of first-degree criminal abuse. She was sentenced according to the jury's recommendation to 35 years for the murder, plus 10 years for the criminal abuse, all to be served consecutively for a total of 45 years. She now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

Appellant raises three issues on appeal, two of which relate only to the abuse conviction. First, she contends that because the first-degree criminal abuse charge jury instructions failed to specify what injury or abusive act the jury should consider, she did not receive a unanimous verdict on that conviction. Second, she contends that the trial court erred in denying her directed verdict motion on the first-degree criminal abuse count because there was no evidence that the Appellant abused the victim. Third, she contends that the trial court committed palpable error as to all counts by allowing a police detective to effectively testify that Appellant was lying. Because the directed-verdict claim could result in an acquittal on the count of first-degree criminal abuse and thus render the first issue moot, the Court will address that issue first.

### A. The trial court did not err by denying Appellant's motion for a directed verdict for the charge of first-degree criminal abuse.

■ Appellant claims that the trial court erred in denying her motion for a directed verdict at the close of all the proof on the first-degree criminal abuse count.[1] She argues that there was absolutely no evidence that she committed first-degree criminal abuse against the victim, her son Stephen Carl Troy, between August 28, 2009, and October 23, 2009, the time frame laid out in the jury instruction. The charge, as laid out in the instruction, specifically excluded the fatal blow to Stephen, which was covered by the murder instruction, and instead could only have applied to the leg fractures and the acts leading to them. It is from this denial of her motion for a directed verdict that she now appeals.

■ Under the standard for a directed verdict, a court must consider the evidence as a whole, presume the Commonwealth's proof is true, draw all reasonable inferences in favor of the Commonwealth, and leave questions of weight and credibility to the jury. *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky.1991). Having undertaken this process, the trial court is authorized to grant a directed verdict if the Commonwealth has produced no more than a mere scintilla of evidence, but it should not do so if more than a scintilla of evidence is produced from which it would be reasonable for the jury to return a verdict of guilty. *Id.*

1. The offense of first-degree criminal abuse is created by KRS 508.100, which states:
 A person is guilty of criminal abuse in the first degree when he intentionally abuses another person or permits another person of whom he has actual custody to be abused and thereby:
 (a) Causes serious physical injury; or

 (b) Places him in a situation that may cause him serious physical injury; or
 (c) Causes torture, cruel confinement or cruel punishment;
 to a person twelve (12) years of age or less, or who is physically helpless or mentally helpless.

■ On appellate review, the standard is more deferential. The trial court should be reversed only if "it would be *clearly unreasonable* for a jury to find guilt." *Id.* (emphasis added). Thus, in Appellant's case, this Court is required to examine the evidence introduced at trial concerning whether she committed first-degree criminal abuse against the victim within the dates sets forth in the jury instruction.[2]

A review of the Appellant's brief and pertinent portions of the record reveals the following proof and facts relevant to the directed-verdict question. In July 2009, Appellant and her son Stephen Carl Troy moved in with her boyfriend Will Callahan and his two children. Despite living with Callahan, Appellant also had regular contact with Michael Troy, who was Stephen's biological father. Appellant and Michael had spoken regularly about reconciling their relationship and moving back in together. By all accounts, Stephen spent a substantial amount of time with his maternal grandfather, Harry Johnson, and his wife Susie, as well as with Michael Troy's stepmother, Melissa Troy, and brother, Chris Troy. The story provided by Appellant was that a number of people had access, both supervised and unsupervised, to Stephen during the time frame in which Appellant was alleged to have committed first-degree criminal abuse against Stephen (August 28, 2009 to October 23, 2009).

At trial, Dr. Emily Craig testified, based on her post-mortem investigation, that Stephen had suffered three leg fractures. On or about August 28, the starting date listed in the jury instruction, Stephen sustained a fracture to his left tibia classified as a "toddler fracture." Dr. Craig testified that this type of fracture is fairly common among toddlers and generally results when the toddler's foot is in a fixed position and momentum causes the toddler's body to "twist." Appellant made a statement to police that was played at trial in which she testified that she saw the child stand up to get out of a toy car that he had been driving around, caught his foot, and his body weight twisted his leg. Apart from Appellant's testimony, there was no other testimony at trial as to what might have caused Stephen's first fracture.

Dr. Craig also testified about the other two fractures she discovered during her investigation. She testified that the second[3] and third[4] fractures were of types caused by the exact opposite situation as

2. The parties' briefs, which by Civil Rule are to lay out the facts and the parties' legal arguments, are essential to this undertaking. The Commonwealth's brief was completely inadequate and did not even comport with the requirements of the Civil Rules. The Commonwealth's Counterstatement of the Case was all of two paragraphs and had no direct citations to the record, despite the fact that Appellant has pursued a factually intensive directed-verdict claim. The Commonwealth's response to Appellant's legal argument consisted largely of the following conclusory claim: "The Commonwealth has thoroughly reviewed the record, argument of opposing counsel, and the applicable law concerning Issues I and II of Appellant's brief. *The law speaks for itself.* Therefore, the Commonwealth simply requests that the Court apply to

[sic] law to the facts as it sees fit." (Emphasis added.) If there is one truism regarding the law it is that it rarely speaks for itself. More importantly, given the issue at hand, the *facts* rarely speak for themselves, especially when they are contained in a video record that can at best be viewed a little faster than real-time. And despite the implicit invitation to do so, this Court is not inclined to simply take the Commonwealth's word for it that the Appellant's claims are wrong.

3. Dr. Craig characterized this fracture as a "spiral fracture" to Stephen's left tibia.

4. Dr. Craig identified this third fracture as a "butterfly fracture," which she testified was a more severe category of fracture than the other two.

the first fracture. These types of fracture are generally caused where the body is in a fixed position, but the foot itself is twisted. When asked whether those two fractures are common *accidental* fractures for a child Stephen's age, Dr. Craig stated, "Not in my opinion." She explained that this was because such fractures "are more likely associated with the body being fixed and the foot twisting." When asked whether the literature indicates that those two fractures are "indicative of abuse," Dr. Craig concluded that "most of the literature says almost across the board that the difference is, between accidental injury and inflicted injury, multiple fractures in various stages of healing."

Dr. Craig testified that the second fracture was likely sustained in mid-September, five to seven weeks prior to death, based on evidence of healing (the "callus"), and that it was more akin to injuries caused by abuse. In her brief, the Appellant stated, likely in an attempt to suggest that she did not have the opportunity to cause this fracture, that around September 25, 2009, she spent a week in the Intensive Care Unit while the victim stayed with his father Michael. This period in intensive care could have overlapped at most in part with the period when the second fracture likely occurred.

The third fracture that Dr. Craig discovered in her investigation was the most recent injury, according to her testimony, because it still had "fresh blood" in the fracture and the callus that forms around fractures was still "soft." Dr. Craig testified that the evidence showed that the fracture had been healing for approximately two weeks before the victim's death, or approximately the first week of October 2009.

Dr. Craig's testimony was at least circumstantial proof that criminal abuse occurred. Though she could not say with certainty that the victim was abused, her testimony that the type of fracture seen in the second and third injury is rare in toddlers and that multiple such fractures is indicative of abuse was at least circumstantial proof that criminal abuse occurred (i.e., the corpus delicti). Thus, Dr. Craig's testimony supported the Commonwealth's theory behind its first-degree criminal abuse charge, namely, that the victim's injuries were caused by some abuse. Dr. Craig's testimony was also very circumstantial proof, in light of the fact that Appellant was the victim's mother and primary caregiver, that she must have committed the crime.

This proof was buttressed by the Commonwealth's introduction of testimony from Will Callahan that he had seen Appellant abuse Stephen on at least two occasions. Callahan testified that on one occasion he witnessed Appellant throw Stephen onto the couch. He also testified that a few days before Stephen's death, he had seen Appellant strike Stephen hard in the back, albeit not with a closed fist.

The proof was further supported by testimony that the Appellant had lied to the people who asked about Stephen's trouble walking and whether she had taken him to see a doctor. This trouble was likely the result of the child's multiple leg fractures. Appellant told multiple people that she had taken the child to the hospital for the problem, but proof at trial showed that she had never done so. At the very least, this is circumstantial proof of Appellant's consciousness of her own guilt and fear that a trip to the hospital might reveal the abuse she had caused. The neighbor's testimony about Appellant's actions after bruising was discovered was also probative, albeit minimally, of Appellant's guilt.

Under the prevailing standard of review for a directed-verdict decision on appeal, this Court simply cannot say that the trial

court was required to direct a verdict in Appellant's favor.

The proof sufficiently proves that criminal abuse occurred. Specifically, Dr. Craig's testimony demonstrated that at least two instances of abuse likely occurred whereby Stephen sustained the last two fractures. The proof also showed that these acts occurred during the time that Appellant was Stephen's primary caregiver. Other proof, however, showed that other people, including at least one person who had previously abused a child, had access to the child during this time.

However, this proof by itself likely would not have been enough to show that Appellant was guilty. Dr. Craig's testimony, when combined with proof that Appellant and other people had the opportunity to commit the abuse, would not allow a reasonable jury to find guilt beyond a reasonable doubt because there is little assurance that Appellant, rather than someone else, committed the abuse. Such "opportunity only" evidence has been condemned as insufficient to survive a motion for a directed verdict. *See, e.g., Marcum v. Commonwealth,* 496 S.W.2d 346, 349 (Ky. 1973) ("neither motive alone nor motive plus opportunity (or presence at the scene) is enough to justify a conviction").

In this case, however, other evidence suggested that Appellant was indeed the perpetrator. Specifically, Will Callahan's testimony was clear that Appellant had abused Stephen on at least two occasions. More damning were Appellant's falsehoods about whether she had taken her child to the doctor when he was clearly suffering from some type of injury or illness. This testimony evinced Appellant's consciousness of guilt. There was also evidence that Appellant ultimately killed her child with an abusive act, and the same jury convicted her of that crime. Indeed, Appellant has not even challenged whether

she was entitled to a directed verdict on that offense. All this evidence combined could be perceived to show that Appellant, rather than someone else, committed the abusive acts that resulted in the leg fractures.

While certainly we cannot say that this amounts to an abundance of evidence, we likewise cannot say that it was a mere "scintilla" of evidence of Appellant's guilt under *Benham.* This is one of the rare instances where the individual pieces alone might not suffice but the totality of the evidence has a cumulative effect that rises above a "scintilla," and would allow a reasonable jury to believe that Appellant committed criminal abuse that resulted in one of the latter two leg fractures. Thus, while extremely circumstantial, there was nevertheless "evidence of substance" from which "reasonable minds might fairly find guilt beyond a reasonable doubt." *Commonwealth v. Sawhill,* 660 S.W.2d 3, 4 (Ky.1983).

Additionally, while another jury might very well acquit on such proof, this Court is bound to review the issue as an appellate court after the return of a verdict. Under that standard, this Court cannot say that it was "clearly unreasonable" for the jury to find that Appellant had in fact committed the criminal abuse in this case, and we therefore affirm the trial court's denial of Appellant's motion for a directed verdict.

**B. The jury instructions presented a unanimous verdict error.**

Appellant also argues that the first-degree criminal abuse jury instruction presents a unanimous verdict error. The jury instruction read:

> You will find the Defendant guilty of First–Degree Criminal Abuse under this instruction if, and only if, you believe

from the evidence beyond a reasonable doubt all of the following:

 A. That in this county on or about and between the dates of August 28, 2009 and October 23, 2009, and before the finding of the Indictment herein, she intentionally abused Stephen Carl Troy;

 B. That she thereby caused a serious physical injury to Stephen Carl Troy;

 C. That Stephen Carl Troy was at that time 12 years of age or less;

AND

 D. That the abuse inflicted was other than the fatal injury to Stephen Carl Troy's abdomen that occurred on or about October 23, 2009.

The proof at trial showed two injuries—the second and third leg fractures—and acts that caused them that could satisfy this instruction. (The other evidence of injuries, such as bruising and the first leg fracture, could not because they either could not be a serious physical injury or were not caused by abuse.)

The jury instruction, however, does not specify which of the leg fractures the jury should have considered in determining whether to convict Appellant of the offense. Appellant contends that this lack of specificity as to which act of abuse the Appellant committed (i.e., which serious physical injury she caused) presented a scenario whereby some jurors might have believed that she caused the first fracture, while others believed that she caused the second fracture, and so on. Thus, Appellant contends that there is no guarantee that she received a unanimous jury verdict as required by the Sixth Amendment to the United States Constitution. Appellant concedes that any error is unpreserved and thus should be reviewed only for palpable, error. RCr 10.26.

▮ Before turning to the issues as raised by the Appellant, this Court must note that the federal constitutional provisions requiring unanimous juries that she cites have no applicability to states. The federal constitution's requirement of unanimity has been held not to apply to the states. *See Apodaca v. Oregon,* 406 U.S. 404, 411, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); *Johnson v. Louisiana,* 406 U.S. 356, 359, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). This state's courts, however, have long held that "Section 7 of the Kentucky Constitution requires a unanimous verdict." *Wells v. Commonwealth,* 561 S.W.2d 85, 87 (Ky.1978); *see also Coomer v. Commonwealth,* 238 S.W.2d 161 (Ky. 1951); *Cannon v. Commonwealth,* 291 Ky. 50, 163 S.W.2d 15 (1942). The Appellant's brief does not rely on the Kentucky Constitution for this claim. Nevertheless, we will analyze the claim as one brought under that document's protection because Appellant has clearly alleged that her right to a unanimous verdict has been violated. That she has mistakenly claimed that right under the federal constitution when it is instead protected by the state constitution is no bar to her claim.

Turning to Appellant's claim, she argues that the Court should rely on *Harp v. Commonwealth,* 266 S.W.3d 813 (Ky.2008), in determining that the jury instruction failed to require the jury to reach a unanimous verdict. In *Harp,* the defendant had been convicted of multiple counts of sexual abuse under identical jury instructions. The Court determined that the lack of distinguishing language in each jury instruction led to a palpable unanimous verdict error because "in a case involving multiple counts of the same offense, a trial court is obliged to include some sort of identifying characteristic in each instruction that will require the jury to determine

whether it is satisfied from the evidence the existence of facts proving that each of the separately charged offenses occurred." *Id.* at 818.

■ But *Harp* is distinguishable from Appellant's case. Unlike in *Harp,* where the defendant was convicted of seven unique counts of the same crime, Appellant was charged with and convicted of only one count of first-degree criminal abuse. The jury in Appellant's case considered only one instruction, not multiple identical instructions, and that single instruction contained a specific timeframe for the jury to consider. Thus, the rule of specificity in *Harp* is simply inapplicable to this case.

This, however, does not mean that Appellant's case does not present a unanimity issue. While the lack of specific details in this jury instruction could not have led to confusion with another identical jury instruction, it does make it unclear what criminal act the verdict covered. As the jury was instructed, its verdict could have covered either of the fractures that were caused by abuse, since the time frame listed in the instruction included both of them.[5] Specifically, the jury instruction described a two-month period in which the abuse allegedly occurred. But the proof in this case showed two instances of abuse—the second and third leg fractures—during that time frame. The instruction itself did not require the jury to differentiate which of the two instances was the basis of the conviction.

Our recent case law has touched on this type of instruction, most frequently when the instruction itself describes two different criminal offenses (e.g., robbery against victim A and robbery against victim B). The issue here is slightly but not functionally different, since the alleged error here was not raised by the instructions themselves, but by the proof, which showed multiple criminal acts. Regardless of how it happens—either when the instruction explicitly includes multiple criminal offenses or the proof demonstrates them—when a jury instruction and resulting verdict cover multiple criminal acts, the same principles apply.

The legal question presented by this case, then, is whether such an instruction and resulting jury verdict violate the requirement of juror unanimity. While some of our recent case law suggests that such a scenario does not, other cases suggest that it does. Thus, the issue is far from decided, and given the frequency with which this Court is confronted with this precise issue, it is now time to resolve it.

■ We now hold that such a scenario—a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof—violates the requirement of a unanimous verdict.

Because our holding affects previously decided cases, a review of those cases is necessary. This issue first came to the fore in an unpublished decision: *Garrett v. Commonwealth,* 2008–SC–000471–MR, 2010 WL 5238638 (Ky. Dec. 16, 2010). The jury instruction in that case combined two different robberies, one committed against Johnson and one against Ruff, in a single count. The Court affirmed this conviction, albeit in a plurality joined by only three justices, stating that the two robberies were simply different theories of the offense under *Halvorsen v. Commonwealth,* 730 S.W.2d 921, 925 (Ky.1986). Two justices concurred in the result only without opinion. Two justices dissented.

---

**5.** It also very likely could have covered the first fracture, which was not caused by abuse, since the instruction's two-month time frame began when that fracture likely occurred.

Yet in *Bell v. Commonwealth,* 245 S.W.3d 738 (Ky.2008), *overruled on other grounds by Harp v. Commonwealth,* 266 S.W.3d 813 (Ky.2008), the Court stated it would reverse a conviction based on a similar instruction. Bell was convicted of one sodomy count under a single instruction, even though the Commonwealth presented evidence at trial of multiple sodomies. That case differs somewhat from this one because the jury was originally instructed on multiple counts of sodomy. But the jury chose to convict the defendant of only one count, which made it unclear which criminal act the jury believed the defendant had committed. Thus, the Court stated:

> [I]t must be evident and clear from the instructions and verdict form that the jury agreed, not only that Bell committed one count of sodomy, but also *exactly* which incident they all believed occurred. Otherwise, Bell is not only denied a unanimous verdict, but is also stripped of any realistic basis for appellate review of his conviction for sodomy. In other words, without knowing which instance of sodomy is the basis of his conviction, Bell cannot rationally challenge the sufficiency of the evidence on appeal.

*Id.* at 744. The Court noted that if the sodomy conviction had not already been reversed on other grounds it "would have constituted palpable, reversible error," *id.,* and all concurred in this opinion.

Though *Harp* is distinguished above as presenting a different scenario, it did address this issue in a footnote. In addition to the sexual abuse counts in that case, the defendant was charged with a single count of sodomy. The instruction to the jury included no details of the crime. The opinion is unclear whether there was proof of multiple instances of sodomy, though it seems there is no other way for this issue

to have arisen. We declined to reverse, stating:

> No unanimity problem is apparent in regards to that instruction because Harp was charged with only one count of sodomy. Our precedent does not support a conclusion that a trial court is required to include any identifying evidentiary detail in instructions in which a defendant is charged with only one count of an offense.

*Harp,* 266 S.W.3d at 821 n. 25.

The Court tackled the issue more directly in *Bennington v. Commonwealth,* 348 S.W.3d 613 (Ky.2011), in which the defendant was charged with and convicted of multiple instances of rape, sodomy, and incest. Each instruction on each count covered a time period, usually of one year, but the proof showed multiple instances of each crime during each time period (per the victim's testimony, every night). The Court held:

> While the instructions do not detail the specifics of each particular instance of sodomy, rape, and incest, such as the setting or the exact conduct engaged in, such detail is not required. There is no uncertainty as to which crime the jury convicted of on each count and thus, no deprivation of a unanimous verdict.

*Id.* at 623.

This issue was also presented by the facts of *Commonwealth v. Leinenbach,* 351 S.W.3d 645 (Ky.2011), though the defendant does not appear to have raised it. At the very least, that case seems to cover the scenario in this case indirectly. The evidence showed that, on the same day, the defendant had raped the victim once in his car and *twice* at his house. The defendant was charged with only one count of first-degree rape rather than three. The jury instructions provided that the jury could find the defendant guilty of the crime if it found that he had raped the victim "in the

[car]" or, alternatively, "in the Defendant's residence." [6] *Id.* at 646. Though not stated explicitly in the opinion, the jury convicted under the alternative instruction (rape in the house).

The Court declined to find any prejudice in this approach, and noted that it was "quite clear *from the evidence* that Leinenbach could have been charged with more than one count of rape," but still concluded that "the instructions make clear the exact criminal misconduct for which the jury unanimously found him guilty." *Id.* at 647 (emphasis added). The Court also noted: "We can hardly find prejudice when the Commonwealth, in effect, gave Leinenbach leniency by combining multiple crimes into one charge and one penalty." *Id.* at 648. The Court cautioned that "[o]nce the Commonwealth used its prosecutorial discretion in consolidating the events of August 12th into one charge, the trial court had to make certain that the jury instructions insured a unanimous verdict." *Id.* But the Court declared that "the instructions met that challenge" because the trial court had split the jury instructions into the two locations where rape might have occurred. *Id.*

The Court did not expressly address any possible problems with the fact that the jury instruction under which the defendant was convicted—the alternative, "residence" instruction—actually applied to two rapes. The closest the Court came to dealing with this issue was in addressing the claim that the verdict represented an acquittal on the rape in the car. The Court held that it was not an acquittal (a now questionable claim, since the language of the instructions make it seem analogous

to acquitting on the higher charge and choosing a lesser-included offense), and stated there was no prejudice, since the jury simply chose between one of two options, likely the one best supported by the proof. In essence, the Commonwealth was allowed to present proof that two rapes occurred in the house for the purposes of proving only one rape charge, so it is no wonder why the jury chose that theory.

Ultimately, the Court did not reverse in *Leinenbach.* It may simply be that the issue regarding the combining two in-residence rapes in one instruction was not raised in the brief.

What these cases show is an unfortunately inconsistent approach to this issue, which criminal appellants seem to be raising more and more. No doubt, part of the problem is in properly describing the issue, since it does not fit into any of the usual categories of possible unanimity error (such as when multiple theories of a single crime are in one instruction). And thus courts have struggled with this issue. But time has a way of clarifying matters.

Perhaps the best place to start is the unexamined issue in *Leinenbach.* The proof in that case showed two rapes in the house, but the jury returned a general verdict, meaning that while all the jurors agreed that a rape occurred, there is no assurance they all agreed on which act of rape. While rape is the charge, every rape is distinct and individual on its facts. We have been suggesting in cases that it does not matter which *acts* a given juror believed, so long as they all believed there was *a* rape. But if only four believed it was Act A, while eight believed it was Act B, there could *not* be a conviction on either

6. The "car" instruction (Instruction No. 5), included the following language: "If you find the defendant guilty under this Instruction, please skip Instruction No. 6 and go to Instruction No. 7. If you find the Defendant Not

Guilty under this instruction, please go to Instruction No. 6." *Commonwealth v. Leinenbach,* 351 S.W.3d 645, 646 (Ky.2011). Instruction No. 6 described a rape in the defendant's residence.

act. How can we justify adding Acts A and B to come up with a single conviction? The *name* of the offense is not the *offense*. The forbidden act we call rape is set out in the statute. It would be the same act if we called it hopscotch. But twelve jurors must believe that the same act occurred before a defendant can be convicted of a crime, whatever it is called.

Federal law suggests that to pass constitutional muster, jury instructions must specify the criminal act covered by each verdict if the proof shows more than one criminal act. According to the Supreme Court, it is axiomatic "that no person may be punished criminally save upon *proof of some specific illegal conduct.*" *Schad v. Arizona*, 501 U.S. 624, 633, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion) (internal quotation marks omitted) (emphasis added). In *Schad*, the Court was tasked with deciding whether the inclusion of two different mental states,[7] each of which was sufficient to prove first-degree murder, was permissible under the Due Process Clause. No opinion garnered a majority vote. Ultimately, the Court, by way of a four-vote plurality and single concurrence, concluded that such an instruction and the resulting conviction were permissible because regardless of the mental state, there was only *one* crime. This outcome is consistent with our case law, such as *Halvorsen*, allowing multiple theories of a single crime to be included in a single jury instruction.

While *Schad* does not directly answer the question before us, the Court nevertheless touched on it. For example, the plurality *assumed* that two separate offenses could not be joined in a single count:

Just as the requisite specificity of the charge *may not be compromised by the joining of separate offenses*, nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction.

*Id.* at 633, 111 S.Ct. 2491 (emphasis added). This principle was so fundamental, that the Court could not even find one of its own precedents to cite for it, relying instead on a circuit court opinion, *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir.1976).

In his concurring opinion, Justice Scalia was even more explicit about this principle: "We would not permit ... an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the 'moral equivalence' of those two acts." *Schad*, 501 U.S. at 651, 111 S.Ct. 2491 (Scalia, J., concurring in part and concurring in the judgment).

Justice Scalia's hypothetical is almost exactly the scenario presented by this case—a single count that led to a single verdict covering an act of criminal abuse that occurred at one time (5–7 weeks before death) and a second such act that occurred at a later time (2 weeks before death). The only difference between Justice Scalia's hypothetical and this case is that the victim here was the same person in both instances. But that is not a material difference. There were still multiple crimes covered by a single verdict.

---

7. The two mental states were premeditation and killing in the course of committing a felony.

Even more like this case is *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991), *cert. denied*, 510 U.S. 821, 114 S.Ct. 77, 126 L.Ed.2d 45 (1993). In that case, the defendant was charged with two counts of perjury. The counts, as laid out in the indictment, were lengthy and recited many of the defendant's false statements. In fact, each count included multiple knowingly false statements, each of which could have supported a separate perjury charge. The defendant requested a specific unanimity instruction, which the trial court denied. On appeal, the Fifth Circuit distinguished the multiple-theory approach of *Schad*, which involved "a single killing of one individual," which "was a single crime." *Id.* at 927 (quotation marks omitted). The court stated that *Schad* "differs . . . from the situation where a single count as submitted to the jury embraces two or more separate offenses, though each be a violation of the same statute." *Id.* The court then reversed the convictions because the "instruction d[id] not . . . require that all of the jurors concur in the knowing falsity of at least one particular statement." *Id.* at 929.

In reaching this result, the court relied heavily on *Bins v. United States*, 331 F.2d 390 (5th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964), in which the defendant was charged with two counts of making a false statement on a loan document. Each count, in turn, alleged false statements on two loan documents, Form 2004C and Form 2004G. In reversing the convictions, the court stated that "[t]he filing of each false document would constitute a crime, and each should be alleged in a separate and distinct count of the indictment." *Id.* at 393. The court concluded that the failure to correct this omission with a limiting instruction was error. *Id.* The court noted:

> This [error] becomes clear when you try to determine what the jury found. The jury cannot find a defendant guilty as to one of the offenses charged in the duplicitous count and not guilty as to the other charge in the same count; and a general verdict of guilty does not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty of all of them. More specifically, it is impossible to determine whether the jury found appellant guilty of making, passing, uttering, and/or publishing Form 2004C, or doing so as to Form 2004G, or both.

*Id.*

The precise error in these federal cases is known as "duplicity," which means "the joining in a single count of two or more distinct and separate offenses." *United States v. Starks*, 515 F.2d 112, 116 (3d Cir.1975). In other words, a duplicitous count includes in a single count what must be charged in multiple counts.

The federal courts have roundly condemned duplicitous indictments. *See, e.g., Holley*, 942 F.2d at 929.[8] The federal courts allow correction of such flawed indictments with instructions requiring the

---

**8.** The federal focus on indictments, rather than jury instructions, stems from the fact that the federal courts use more detailed indictments than we do. The federal courts also seem to employ a stronger connection between the indictment and jury instructions, which lay out what the jury must believe to find the defendant guilty under the indictment. In fact, federal jury instructions will frequently note that the defendant has been charged with the crime before saying what the jury must find factually to find the defendant guilty of that crime. While this process is technically what happens in Kentucky, the use of notice-pleading-style indictments, which are fleshed by bills of particulars, and jury instructions requiring the jury to find the defendant guilty or not guilty "under the instructions," focus more on the jury instructions.

jury to agree as to which criminal act the defendant committed, and the lack of such an instruction is reversible error. *See Holley*, 942 F.2d at 929. The federal courts also reverse when faced with a duplicity issue for the first time in instructions instead of the indictment. *See, e.g., Johnson v. United States*, 398 A.2d 354, 369–70 (D.C.1979).

■ A duplicitous count, whether appearing in an indictment or jury instructions, presents multiple constitutional problems, including that the jury verdict is not unanimous, which is the issue raised in this case. "The courts have stated that two of the reasons for rejecting duplicitous indictments are that 'a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or both' and that 'there is no way of knowing ... whether the jury was unanimous with respect to either.'" *Id.* at 369–70 (quoting *United States v. Starks*, 515 F.2d 112, 116–17 (3d Cir.1975)). A duplicitous count affects other interests and rights, including the right to adequate notice of the charges and the bar on double jeopardy.[9] Duplicity thus affects the "fundamental due process rights of defendants." *UCO Oil Co.*, 546 F.2d at 835.

When it is the jury instruction for a single count that covers two different instances of the crime, "[t]hese principles apply with equal force." *Johnson*, 398 A.2d at 370. In *Johnson*, the D.C. Circuit applied this rule to an instruction and resulting verdict that covered two different assaults with intent to kill the victim—one in which the defendant tried to push the victim through a fifth floor window and a second one in which the defendant threw the victim in a river—and found the instruction to be in error. Those facts are extremely similar to this case. In both cases, multiple assaults against a single victim were joined in a single count. Just as this was error in *Johnson*, so too it is error here.

9. Other courts have explained in more detail the problems with combining multiple offenses into a single count. For example, the Third Circuit has said:

> One vice of duplicity is that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both. Conceivably this could prejudice the defendant in protecting himself against double jeopardy.
>
> Another vice of duplicity is that a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or of both. Conceivably, this could prejudice the defendant in sentencing and in obtaining appellate review.
>
> A third vice of duplicity is that it may prejudice the defendant with respect to evidentiary rulings during the trial, since evidence admissible on one offense might be inadmissible on the other. Joining conspiracy and substantive offenses in the same count present this vice in a particularly aggravated form, because of the admissibility of declarations made by coconspirators.

> Assuming such a joinder, and a general guilty verdict, there would ordinarily be no way of discerning whether the jury found the defendant guilty of the offense in proof of which such coconspirator's admissions were properly admitted.
>
> Finally, there is no way of knowing with a general verdict on two separate offenses joined in a single count whether the jury was unanimous with respect to either.

*United States v. Starks*, 515 F.2d 112, 116–17 (3d Cir.1975) (footnote omitted, paragraph breaks added); *see also United States v. Washington*, 127 F.3d 510, 513 (6th Cir.1997) ("The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both. Furthermore, the jury cannot convict on one offense and acquit on another offense charged in the same count. Duplicity can potentially prejudice the defendant in sentencing, obtaining appellate review, and protecting himself against double jeopardy." (citations and quotation marks omitted)).

While the federal case law on this subject is not controlling, since the federal constitution's unanimity requirement has not yet been held to apply to state criminal juries, these cases are nonetheless persuasive. That is strengthened by the fact that Kentucky, unlike some states, requires unanimous verdicts in criminal trials under the state constitution. The logic of the federal decisions is inescapable, and certainly "unanimity" has the same dictionary meaning in any court. Moreover, the various states have a long history of reversing convictions for including multiple instances of a crime in a single count. *See, e.g., State v. Brown,* 58 Iowa 298, 12 N.W. 318 (1882) (reversing conviction for assault when the proof showed two separate assaults); *Lebkovitz v. State,* 113 Ind. 26, 14 N.E. 363 (1887) (reversing conviction for sale of liquor); *Boldt v. State,* 72 Wis. 7, 38 N.W. 177 (1888) (same).

Duplicitous convictions also run afoul of the modern criminal rules. Criminal Rule 6.18 specifically requires "a separate count for each offense" in an indictment. Again, that rule must extend throughout the proceedings.

That this is a difficult issue is unquestionable. The biggest hurdle is in understanding that cases like this one do not present multiple theories of a crime, but instead multiple distinct crimes under a single count. Thus, unlike the case where two theories—such as two means or mental states—of a single crime are presented in an instruction, we have an instruction that includes multiple crimes but directs only one conviction. Recently, we have been allowing the latter type of conviction, though not always, saying that different crimes are simply different theories of a defendant's single offense.

But that is like giving directions to a McDonald's on the east side of town to half a group of travelers, and directions to one on the west side of town to the other half, despite a rule that requires all the travelers to go to the same restaurant. Both groups arrive at *a* McDonald's, but not all the travelers are in the same place.

The unanimity requirement mandates that jurors end up in the same place. When we give the kind of instruction in this case to juries, they are forced by its language to *appear* to end up in the same place in order to convict. But that appearance is illusory because we can never know whether the jurors are indeed in the same place. Such instructions make it possible that some of the jurors may vote for the first crime, and some may vote for the second, with all agreeing that the defendant committed a crime. In other words, all of the jurors end up convicting (i.e., arriving at *a* McDonald's), but some of the jurors voted for one instance of the offense (i.e., the east-side McDonald's) and some voted for the other (i.e., the west-side McDonald's). We have no certainty that twelve people found the defendant guilty of the same instance of the crime.

We now conclude that such jury instructions present error of a constitutional magnitude. Admittedly, this poses some logistical hurdles for lawyers and courts, but they are necessary to effect the right to a unanimous verdict. We offer the following guidance for future cases.

■ Where there are distinct offenses—that is, different criminal acts or transactions—lawyers and trial courts must take steps to assure the unanimity of the jury and the due process rights of the defendant. The most obvious way would be for prosecutors to charge each crime in a separate count and then for the trial court to instruct the jury accordingly at trial.

■ In some cases, unfortunately, the Commonwealth will find that it has failed to charge properly because the proof to be

offered at trial will establish multiple crimes. This often happens as investigations continue after a defendant has been indicted and new information is discovered. In such a case, the best option may be to require the Commonwealth to elect before trial which instance to prosecute and then be careful to limit the proof at trial to that single instance of the crime.[10] Alternatively, the jury instruction could specify one criminal act that has been proven at trial, or the jury could be given a specific unanimity instruction, as is done in the federal system, requiring its members to agree unanimously which criminal act on which they are convicting.

Of course, these post-indictment options raise substantial problems—such as lack of notice to the defendant, since it is unclear what alleged criminal act is covered by the indictment, and violations of evidentiary rules like KRE 404(b), since evidence of uncharged crimes will have been admitted at trial. Perhaps most troubling is that such an approach at trial allows prosecutors multiple bites at the apple in a single case. They will have alleged a single crime, yet they will have put on proof of multiple crimes and received a jury instruction that either cherry picks the best-supported crime (election during trial) or allows the jury to consider all of the proof and choose from among the acts so long as it is unanimous (specific unanimity instruction). That is why the first two options—to charge properly from the beginning or, failing that, to require pre-trial election on the criminal act and to limit the proof at trial—are the better options.

Regardless, the failure to follow one of these options, or to take some other step to guarantee juror unanimity, will result in a compromised verdict. It will be unclear whether the jury agreed on which criminal act the defendant committed, which implicates unanimity and due process. It will be unclear whether the defendant had proper notice of what crime he was on trial for. It also makes appellate review difficult if not impossible, since it is not clear which criminal act the verdict covers and thus which evidence needs to be examined for sufficiency of the evidence.

Admittedly, there are a variety of crimes where complying with this mandate will not be easy because of the difficulty in breaking the crimes down into specific but distinct instances based on witness recollections. We frequently see this in child sex-abuse cases, where the child is unable to testify to specific instances of abuse (such as on a certain date) but instead describes patterns of conduct over time (such as that the act occurred every night). Frequently, the defendants in such cases get jury instructions that apply to the time period in which the multiple incidents occurred and for which, if the proof was more specific and multiple counts were charged, multiple convictions could result.

But the fact that children have difficulty remembering specifics does not mean that the defendant's rights to a unanimous verdict and due process should be given short shrift. And while pursuing a single charge, instead of hundreds (i.e., one for each night the act may have occurred), makes for a more reasonable trial, that too is no excuse for using flawed jury instructions. Solving this problem takes attention both before and during trial, but we trust that the bench and bar are up to the task.[11]

---

10. As noted above, one of the difficulties caused by duplicitous charges is that they make evidentiary rulings difficult.

11. The legislature could also solve this problem to a great extent by adopting a course-of-conduct approach for sex crimes that a defendant commits multiple times against the same

■ Finally, this understanding of unanimity must be applied to Appellant's case. First, it is clear that the criminal-abuse jury instruction was erroneous. It is impossible to determine from the proof, the jury instruction, and the verdict what criminal act the jury believed Appellant committed. This violated her rights to a unanimous verdict and to due process.

■ The more difficult question is whether this unpreserved error amounts to palpable error. We conclude that it does. A palpable error occurs when the substantial rights of a defendant are violated and a manifest injustice results. RCr 10.26. As we have noted, palpable error's requirement of manifest injustice requires "showing ... [a] probability of a different result *or error so fundamental as to threaten a defendant's entitlement to due process of law.*" *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006) (emphasis added). Elsewhere in that decision, we stated that the rule required deciding "whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4.

This Court concludes that this type of error, which violates a defendant's right to a unanimous verdict and also touches on the right to due process, is a fundamental error that is jurisprudentially intolerable. For that reason, the error in this case was palpable and requires reversal of Appellant's criminal-abuse conviction.

**C. The trial court did not commit palpable error by allowing Detective Allen to testify that Appellant was not truthful in statements she made during audiotaped interrogations.**

■ Appellant's final claim is essentially twofold. First, Appellant contends that the trial court erred by allowing the Commonwealth to play audiotapes at trial of three police interrogations of Appellant conducted in part by Detective Mark Allen over the course of the two days immediately following Stephen's death. The recordings contained instances of a detective telling the Appellant that he thought she was lying. Second, Appellant complains that Detective Allen bolstered Will Callahan's testimony by suggesting that the evidence he collected supported Will's story more than Appellant's story. Appellant concedes that this issue is not preserved for appeal and requests that this Court review for palpable error under RCr 10.26.

As noted above, a palpable error is one that "affects the substantial rights of a party" and will result in "manifest injustice" if not considered by the court. RCr 10.26. This Court has clarified that the key emphasis in defining such a palpable error under RCr 10.26 is the concept of "manifest injustice." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006). "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Id.*

Appellant initially objects to the playing of the tapes because they contain repeated instances where the interrogating detective expressed his opinions about whether the Appellant was telling the truth about the circumstances of the victim's death. Specifically, he stated on tape that Appellant "put [the bruise] there" and "punched him in the back." As the interview progressed, Detective Allen appeared to express more frustration, yelling "I'm so sick

minor victim, as other states have done. *See, e.g.,* Md. Criminal Law Code Ann. § 3–315 ("(a) Prohibited.—A person may not engage in a continuing course of conduct which in-

cludes three or more acts that would constitute violations ... with a victim who is under the age of 14 years at any time during the course of conduct.").

of your bullcrap, bullcrap, bullcrap! You keep sitting there saying [that the police are] lying! When twelve jurors are sitting there, we'll see who's lying!"

Eventually the Appellant appeared to have broken down a bit and told Detective Allen that she "didn't understand," that she was "already dead inside," and she would "give [her] life." Detective Allen continued to push the Appellant to admit to the crime and to admit to lying about bruising on the victim, which she had originally denied seeing. Appellant pleaded with Detective Allen that she was telling the truth, to which Detective Allen responded "I'm not buying into that. I'm wasting my time . . . two days interviewing you . . . we've got enough for an arrest . . . tell [your story] to twelve jurors."

The jury heard these tapes in their entirety.

The issue with playing these audiotaped interrogations in their entirety, specifically the portions of them that contain statements made by a law enforcement official that suggest, if not explicitly state, that the officer believes that the defendant is lying, is very similar to a witness characterizing the testimony of another witness as "lying." It has long been the law of this Commonwealth that a "witness's opinion about the truth of the testimony of another witness is not permitted. . . . That determination is within the exclusive province of the jury." *Moss v. Commonwealth,* 949 S.W.2d 579, 583 (Ky.1997). Technically speaking, however, when an officer makes statements during an interview accusing a person of lying, neither the officer nor the person is a witness at that time. The question, then, is whether the principle in *Moss* extends outside the courtroom so as to make it unduly prejudicial to allow a jury to hear the portions of an interrogation of a criminal defendant wherein an officer accuses the defendant of lying.

This Court addressed this precise issue in *Lanham v. Commonwealth,* 171 S.W.3d 14 (Ky.2005), and held that such statements are admissible. In so holding, the Court decided that *Moss* did not extend to recordings of police interrogations and stated:

We agree that such recorded statements by the police during an interrogation are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes. We also agree that retaining such comments in the version of the interrogation recording played for the jury is necessary to provide a context for the answers given by the suspect.

*Id.* at 27. The Court went on to conclude that the appropriate remedy, rather than making the statements inadmissible, is for the trial court to supply an admonition, in order "to inform the jury that the officer's comments or statements are offered solely to provide context to the defendant's relevant responses." *Id.* at 28 (internal quotation marks omitted). However, such admonitions are not given as a matter of right by the trial court, but must be requested by the defendant.[12] *Id.*

In her brief, Appellant admits that, under *Lanham,* the statements made by Detective Allen on the audiotape were admissible, though she urges this Court to overrule *Lanham.* The reasoning of *Lanham* is sound, and we decline the invitation to reverse it. Thus, Detective Allen's

---

12. Appellant also asserts that the trial court erred by not giving an admonition, but concedes that she never requested one. In *Lanham,* the Court held that the trial court had committed no error by failing to give an ad- monition because the appellant in that case had not requested one. 171 S.W.3d at 28. So too the trial court did not err by not giving an admonition that was not asked for.

statements on the audiotape were admissible, and the trial court did not err in allowing the jury to hear them.

 After the audiotape had finished, the Commonwealth questioned Detective Allen on the stand. Specifically, it asked him to opine as to what various statements made by the Appellant during the interrogation meant. For example, he was asked what the Appellant meant when she said "I'd give my life," "I gave him life," "no one can understand," "I'm hurting," and so forth. Detective Allen testified that he thought that she was trying to "distance herself" from the crime. The Commonwealth asked whether the Appellant was trying to make herself the "victim," and Detective Allen responded that he thought she was. The detective's view of her testimony is not relevant, but in light of the other evidence in the case, this Court cannot say that it rises to the level of manifest injustice for the jury to have heard it.

Additionally, Detective Allen was asked about discrepancies in the Appellant's story of what happened on the morning that Stephen died. According to the detective, Appellant's story changed during the course of various interviews during the two days following Stephen's death, particularly as to bruises located on Stephen's stomach and back. At one point, Detective Allen testified that the bruising was inconsistent with what Appellant had said during her first interview. The Commonwealth suggested, rather, that the bruising "is consistent with what Will [Callahan] told [the trial court] today." Detective Allen agreed.

Appellant contends that this testimony impermissibly bolstered Will Callahan's testimony. Again, Appellant concedes that this issue is unpreserved.

 The law in the Commonwealth is clear that "a witness may not vouch for the truthfulness of another witness." *Stringer v. Commonwealth,* 956 S.W.2d 883, 888 (Ky.1997). Appellant claims that the trial court erred in allowing Detective Allen to testify that Appellant's first story was consistent with Will Callahan's testimony at trial because it suggested that Will's testimony was true and hers was not. Appellant's argument is unpersuasive. The concern that a witness is vouching for another witness stems from the fact that it is the jury's role to determine the credibility of a witness. *See id.* at 894. Thus, one witness may not testify that another witness is telling the truth because such testimony effectively usurps the jury's province to determine witness credibility. Here, however, Detective Allen merely indicated that only one of the two stories that Appellant told was consistent with Will Callahan's testimony. Detective Allen did not say that the jury should believe Will Callahan's testimony. A claim that Detective Allen had impermissibly bolstered Will's testimony would have required the trial court to take the impossible inferential step of determining that the jury in fact believed Will's testimony. There was no error in admitting the testimony, therefore the murder conviction is affirmed.

## III. Conclusion

Appellant was not entitled to a directed verdict but she was deprived of her right to a unanimous verdict by the criminal abuse jury instruction. The trial court, however, did not err in permitting the Commonwealth to play tapes in which the interrogating detective stated that Appellant was lying. While it was error for the detective to testify as to what he thought Appellant meant in her statement, this was not palpable error affecting the remaining murder conviction. Further, the trial court did not err in allowing Detective Allen's testimony regarding discrepancies

in Appellant's story. Thus, Appellant's criminal-abuse conviction and sentence are reversed, though she may be retried on that count since she was not entitled to a directed verdict of acquittal, and the remainder of the judgment of the Laurel Circuit Court is affirmed.

MINTON, C.J.; ABRAMSON and VENTERS, JJ., concur.
CUNNINGHAM, J., concurs in part and dissents in part by separate opinion in which SCOTT, J., joins. KELLER, J., not sitting.

CUNNINGHAM, J., concurring in part and dissenting in part:

I respectfully dissent from the majority's decision to reverse this conviction on the grounds that there was palpable error in regard to the unanimity issue with the jury instructions.

### Jury Instructions were not erroneous

The whole unanimity issue discussed in this opinion exploded upon the appellate scene within the last six years or so. As noted in the majority opinion, the "federal constitution's requirement of unanimity has been held not to apply to the states." Also, as noted by the majority, we recognize that under Section 7 of our state constitution, a unanimous decision by the jury has long been required in criminal cases.

Our Section 7 unanimity cases over the first 110 years of our constitution were fairly simple and straightforward. The 1942 *Cannon* decision and the 1951 *Comer* case dealt with recalcitrant jurors who reported being coerced into a vote, thus undermining the unanimous verdict. Even the 1978 *Wells* case held that alternative methods of an assault case—intentional or wanton—was not a breach of the unanimity requirement.

I submit that we jumped the tracks in the *Harp* case, as well as in *Miller v. Commonwealth*, 283 S.W.3d 690 (Ky.2009). We focused on the wrong issue.

Harp was charged with numerous counts of the same crime. These went to the jury with identical instructions. The jury found Harp guilty of all counts. While the wording is less than clear in *Harp*, it appears we reversed that case on the unanimity issue. And we have thrown *Harp* into our growing line of unanimity cases.

*Miller* is similar to *Harp*, except for one major difference. Miller was not convicted on all identical instructions, as Harp was. *Miller* was rightly decided, I believe, for the wrong reason. It was not a unanimity problem. I respectfully submit that it was actually an appellate due process problem. Miller was denied his right to appeal because he did not know from the jury verdict of which crimes he had been convicted.

*Miller* dealt solely with the lack of unanimity of which *crimes* the defendant committed—not *acts*. Out of seven identical instructions for third-degree rape, Miller was convicted on only four. It was impossible to determine for which of the crimes the jury reached unanimous verdicts. But there was no unanimity problem. The jury was unanimous in finding Miller guilty of some crimes, but not others. But which ones?

The critical issue in *Miller* and in many of our so-called "unanimity" issue cases is that the reviewing court cannot be certain which offense or offenses were committed—not whether the jury voted unanimously. So it is not a unanimity issue. It is a review problem.

I would respectfully submit that the reason we are just recently wrestling so much at the appellate level with the so called "unanimity question" is because we have

mislabeled it. Section 115 of our state constitution states in part: "In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court. . . ." Not knowing for which crime you are convicted deprives one of any effective means to appeal.

I would respectfully submit that, in this case, we are stepping across the line and unnecessarily requiring unanimity in the jury's deliberation. The jury instruction on unanimity is simple. "The *verdict of the jury* must be in writing, must be unanimous and must be signed by one of you as FOREPERSON." 1 Cooper, KENTUCKY INSTRUCTIONS TO JURIES (CRIMINAL) § 2.07A (5th ed.2006) (emphasis added). The jury is commanded only to reach a unanimous decision on the *verdict*.

We are requiring juries to be unanimous on matters that the unanimous verdict requirement never anticipated. We can start with the weather. Juries are not required to unanimously believe the weather was the same on the day of the crime. Neither is the jury required to unanimously agree that the victim was stabbed six times as opposed to nine. If six jurors believe the victim was stabbed six times and six believe the victim was stabbed nine, all twelve jurors—a unanimous jury—has decided the main issue. The victim was stabbed.

And now, in this case, we are requiring the jury to be unanimous in deciding whether the one count of first-degree criminal abuse happened on one date or another, or both. In this case, all twelve jurors have unanimously held that Appellant committed one offense of first-degree criminal abuse.

Our holding here today will create problems and confusion in many different areas of the criminal law. First, let's start with inchoate offenses. Criminal attempt to commit a crime requires a "substantial step" towards the course of conduct planned to culminate in the commission of the crime. KRS 506.010(1)(b). This "substantial step" may be one act or many. Is there a unanimity problem if there is not a delineation of which act or acts the jury unanimously agrees?

The most disturbing result of our decision here today is that it will seriously impair the prosecutions and convictions of those charged with the molestation and rape of small children. A defendant is typically charged with one count of rape of a child under 12 years of age. A small four-year-old toddler testifies and, perhaps with the aid of anatomical dolls, describes the criminal acts committed upon him or her. The victim testifies that the act happened more than once—maybe weekly. It will be impossible for the prosecutor to nail down a certain one as identified by date and place in order to comply with the results of our decision here today.

Here, unlike in *Miller*, it is easily reviewable under the Section 115 requirement. Appellant can easily claim that there was insufficient evidence as to either act for a conviction. This comes close to our analysis in *Travis* and *Dawson*.

### Palpable Error

Our trial judges are being ambushed by such decisions as this one when we so lightly deem palpable error when the mistake has not been preserved. We are watering down our palpable error standard with holdings such as this to the point that it behooves the defense lawyer not to object on jury instructions and just allow the trial court to walk—unwarned—onto the unanimity land mine.

Even if the instructions in this case are deemed error, they are a far cry from "manifest injustice." As evidenced by the present opinion, to which I object, we typically spend page after page doing textbook

analysis of this issue with almost every jury unanimity issue we review. I strongly believe it is totally unfair for us to stand by on this complicated matter and let our trial courts be blind-sided by such a casual application of the palpable error standard.

It is because of this strong sense of fairness to our trial judges that we have developed a long line of cases dictating that we reverse on unpreserved error only in the most drastic of cases. *See McGuire v. Commonwealth,* 368 S.W.3d 100, 112 (Ky.2012) (*quoting Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky.2006)) (*Manifest injustice* is found "if the error seriously affected the 'fairness, integrity, or public reputation of the proceeding.'"); *Chavies v. Commonwealth,* 374 S.W.3d 313, 322–23 (Ky.2012) ("A party claiming palpable error must show a *probability of a different result* or error so fundamental as to threaten a defendant's entitlement to due process of law. It should be so egregious that *it jumps off the page ... and cries out for relief* "); *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky.2006) ("To discover manifest injustice, a reviewing court must plumb the depths of the proceeding ... to determine whether the defect in the proceeding was *shocking* or jurisprudentially intolerable."); *Brock v. Commonwealth,* 947 S.W.2d 24, 28 (Ky. 1997) ("[T]he requirement of 'manifest injustice' as used in RCr 10.26 [ ] mean[s] that the error must have prejudiced the substantial rights of the defendant, i.e., a substantial possibility exists that the result of the trial would have been different."); *Commonwealth v. Jones,* 283 S.W.3d 665, 668 (Ky.2009) ("An unpreserved error that is both palpable and prejudicial still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice, unless, in other words, *the error so seriously affected the fairness, integrity, or public reputation of the proceeding*

*as to be 'shocking or jurisprudentially intolerable.'* ") (Emphasis added throughout citations).

In the case before us—in its worse unanimity posture—six people believed Appellant committed first-degree criminal abuse on one date and six believed the offense was committed on a different date, both within the time period of the charge. Nevertheless, a unanimous jury found Appellant guilty of one count of first-degree criminal abuse. Surely, this is not "palpable error" as we have traditionally envisioned.

I concur in part, but dissent as to the reversal of Appellant's criminal abuse conviction and sentence.

SCOTT, J., joins.