RENDERED: JUNE 15, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0541-MR

MARK JOHNSON                                           APPELLANT

            ON APPEAL FROM MUHLENBERG CIRCUIT COURT
V.                   HONORABLE BRIAN WIGGINS, JUDGE
                        NO. 21-CR-0138

COMMONWEALTH OF KENTUCKY                      APPELLEE

## OPINION OF THE COURT BY JUSTICE CONLEY

## AFFIRMING IN PART, REVERSING IN PART & REMANDING

This case comes before the Court on appeal as a matter of right[1] by Mark Johnson, the Appellant, from the conviction and sentence of the Muhlenberg Circuit Court. After a jury trial, Johnson was found guilty of theft by unlawful taking, $500 - $1,000; and two counts of burglary in the third degree. The jury then found him guilty of being a persistent felony offender in the first degree. The jury recommended a consecutive sentence of five years each for the third-degree burglaries, totaling ten years, with an enhanced sentence to twenty years each for being a persistent felony offender. The total sentence imposed by the trial court was twenty years.

---

[1] Ky. Const. § 110(2)(b).

Johnson now appeals alleging four errors. First, that the greenhouse he burglarized cannot be considered a building under KRS[2] 511.010(1); second, that the instructions for both counts of burglary in the third degree violated his right to a unanimous jury; third, during the penalty phase, the Commonwealth elicited misleading testimony as to when Johnson would be eligible for parole in order to convince the jury to impose the maximum sentence; and fourth, also during the penalty phase, that the Commonwealth elicited testimony about alleged crimes Johnson was charged with but subsequently were dismissed or amended. For the following reasons, we affirm in part, reverse in part, and remand for a new penalty phase to be conducted.

## I.    Facts

Johnson was "friends with benefits" of Samantha Hall. Hall had a Chevy Cobalt vehicle that she frequently used to drive Johnson where he wanted to go. On January 12, 2021, Johnson asked Hall to drive him to a piece of property located on Highway 2270 in Muhlenberg County, owned by Kenneth Dillihay. He told her he wanted to go and steal things. At the Dillihay property, Hall testified, she waited in the car and from there observed Johnson enter multiple buildings, including a greenhouse. Dillihay testified this was a "high tunnel" greenhouse and was being used to store farm equipment and house goats. Specifically, among the farm equipment stored in the greenhouse, was a tiller, grinding stone, miter saw, and a corn sheller. Johnson left the

---

[2] Kentucky Revised Statutes

greenhouse and placed these items in the trunk of Hall's car. The vehicle, however, got stuck in the mud and grass. In the process of dislodging the car, Hall took a photo of the items in her trunk and sent them to a Sheriff's Deputy with whom she worked as an informant. She told the deputy where they were, that "he"—referring to Johnson—was stealing things, and that the car was stuck. By the time the deputy arrived on the scene, Johnson and Hall had dislodged the car, but the deputy testified his visual inspection of the scene showed tire marks and tracks confirming Hall's story. Hall testified she and Johnson drove to his mother's residence and stored the stolen property there. The miter saw, at least, was eventually recovered at the residence by police.

Later, on January 18, 2021, Johnson again asked Hall to drive him to another property for the purpose of theft. This property was on Lonely Lane in Muhlenberg County, and was owned by the Muhlenberg Alliance for Progress, Inc. William Scott was the previous owner, and he had sold the property to the Muhlenberg Alliance but had an agreement with it that he could continue to use the land for farming purposes. Johnson had told Hall that he had previously been to the property on January 16, 2021. Once again, Hall testified to observing Johnson enter multiple buildings on the property, leaving one building with gas cans and another building with milk cans.

Between January 16 and 18, Scott was aware a theft had occurred because he noticed some items missing, including a Marlin rifle. He owned some trail cams and set those cameras up to observe the property. Photos from the trail cameras taken on January 18 show Johnson carrying the gas jugs.

3

The gas jugs were subsequently recovered at Johnson's own residence. During both thefts Johnson was wearing a GPS ankle monitor and records submitted show that Johnson was indeed on the respective properties on the dates in question.

At trial, Johnson sought dismissal of the count for third degree burglary related to the high tunnel greenhouse on the Dillihay property arguing it did not qualify as a building under the controlling statute. That motion was denied. A motion for directed verdict for the same reasons was made at the close of the Commonwealth's evidence and once more at the close of all evidence. Both were denied. When the jury was instructed for the guilt phase, it was given instructions for two counts of burglary in the third degree. No objection was made to these instructions at trial, but Johnson now argues they violated his right to a unanimous jury verdict by failing to require the jury to be unanimous as to which building Johnson had unlawfully entered on either property. After finding Johnson guilty of both counts of third-degree burglary, as well as a misdemeanor count of theft by unlawful taking, a penalty phase was conducted.

During the penalty phase, the Commonwealth called Camron Laycock, the Muhlenberg Circuit Clerk, to testify to eight other felonies Johnson had previously committed. One of these was in fact a misdemeanor conviction. Parole Officer Fouse was called to testify regarding parole eligibility and related sentencing matters, as well as Johnson's record while previously on probation or parole. She testified to numerous parole violations as well as "charges"

4

stemming from said parole violations. Johnson has identified three of these charges as being incorrect, because they were later amended prior to a guilty plea or dismissed altogether. Johnson did not object to any of this testimony during the penalty phase. Regarding parole eligibility, Fouse had a colloquy with the Commonwealth regarding good time credits, the difference between two "calendar years" and "jail years," and the impact this would have on Johnson's total sentence and minimum time served to be eligible for parole. This testimony was also not objected to at trial.

We will develop the facts further below in our analysis, but the law must first be clarified before any fruitful consideration of the facts can be made.

## II.    Analysis

### A. Unanimous Verdicts

The issues presented by this case are the two that have bedeviled this Court for more than a decade in jury unanimity cases: defining precisely what constitutes a juror unanimity issue and proper application of the palpable error standard of review. Justice Cunningham once wryly observed, "we typically spend page after page doing textbook analysis of this issue with almost every jury unanimity issue we review." *Johnson v. Commonwealth*, 405 S.W.3d 439, 461-62 (Ky. 2009) (Cunnigham, J., concurring in part and dissenting in part). Alas, we must venture "once more unto the breach[.]" William Shakespeare, Henry V, act. III, sc. 1, l. 1. The dispositive questions we must answer are first, whether the Commonwealth has presented multiple theories (alternative means) of one burglary in the third degree for each count, or whether each

5

instruction encompassed multiple, separate criminal acts (multiple acts) of burglary in the third degree. If there has been an error in the jury instructions, then we must secondarily determine whether it was palpable.

We begin with a review of our recent precedent on what constitutes a juror unanimity violation. In *Harp v. Commonwealth*, we held

> that in a case involving multiple counts of the same offense, a trial court is obliged to include some sort of identifying characteristic in each instruction that will require the jury to determine whether it is satisfied from the evidence the existence of facts proving that each of the separately charged offenses occurred.

266 S.W.3d 813, 818 (Ky. 2008). In *Johnson v. Commonwealth*, we held "a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof—violates the requirement of a unanimous verdict." 405 S.W.3d 439, 449 (Ky. 2013).

> This type of unanimous-verdict violation occurs when a jury instruction may be satisfied by multiple criminal acts by the defendant. When that is the case, and the instruction does not specify which specific act it is meant to cover, we cannot be sure that the jurors were unanimous in concluding the defendant committed a single act satisfying the instruction.

*Martin v. Commonwealth*, 456 S.W.3d 1, 7 (Ky. 2015), *abrogated on other grounds by Sexton v. Commonwealth*, 647 S.W.3d 227 (Ky. 2022). Finally, a

> third type of unanimity error also appears to exist in our jurisprudence—a potential violation of unanimity stemming from a 'combination jury instruction.' 'A "combination" instruction permitting a conviction of the same offense under either of multiple alternative theories does not deprive a defendant of his right to a unanimous verdict, so long as there is evidence to support a conviction under either theory.'

6

*Brown v. Commonwealth*, 553 S.W.3d 826, 839 (Ky. 2018) (quoting *Robinson v. Commonwealth*, 325 S.W.3d 368, 370 (Ky. 2010)). This leads to the conundrum of the present case as Johnson contends the *Johnson* rule is controlling—that the proof for each count of burglary in the third degree actually supported two separate unlawful entries into two buildings, i.e., multiple acts of the same criminal offense. The Commonwealth contends that the rule cited in *Brown* is controlling—that the two separate unlawful entries into a building for each count are merely alternative theories of how a single crime was committed, and that the proof for each theory was sufficient to support the convictions.

No published authority addressing this precise issue exists in Kentucky. In an unpublished case, however, the Court of Appeals did address it. In *Owens v. Commonwealth*, it wrote

> it can be argued that two theories of guilt were submitted to the jury as to the charge of third-degree burglary. The first theory was that Owens burglarized one or both of Hensley's sheds which abut a locked outbuilding. The second theory was that Owens burglarized the locked outbuilding whose door was pried open. However, as previously discussed, since there is sufficient evidence to support conviction under both of these theories, there is no violation of Owens' right to a unanimous verdict.

No. 2008-CA-000711-MR, 2009 WL 2408382, at *4, (Ky. App. Aug. 7, 2009). The unpublished decisions of an inferior court are not binding upon this Court, and a close reading of *Owens* reveals that this passage was mere dicta and did not actually address the jury unanimity argument advanced by the appellant. *Id.*

7

With its ruling in *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020), the Supreme Court of the United States made the Sixth Amendment's guarantee of a unanimous jury applicable to the states via the Fourteenth Amendment. That changed little in the way of Kentucky law since our own constitution also guarantees unanimous jury verdicts. Ky. Const. § 7. Moreover, the *Johnson* case clearly looked to federal case law for guidance, noted previous instances of the same, and held "certainly 'unanimity' has the same dictionary meaning in any court." *Johnson*, 405 S.W.3d at 455. In other words, the Sixth Amendment and Section 7 are coterminous. Nonetheless, Supreme Court precedent is now binding on this issue rather than merely persuasive. But federal case law offers little in the way of guidance when it comes to differentiating between multiple acts and alternative theories.

The leading cases from the Supreme Court are *Schad v. Arizona*, 501 U.S. 624 (1991) and *Richardson v. United States*, 526 U.S. 813 (1999). *Richardson*'s application outside of its specific statutory context, however, "has been expressly—and consistently—rejected." *State v. Gardner*, 118 Ohio St. 3d 420, 431, 889 N.E.2d 995, 1008 (2008). *Richardson* is readily distinguishable because the crime there focused on a federal statutory crime regarding a "series of violations" thus, it has nothing to offer us in the context of this case. Indeed, it must be noted at this point that the Commonwealth has not argued Johnson was engaged in a continuous course of conduct. *Schad* is more helpful but only in the abstract. It reiterated "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie

8

the verdict." 501 U.S. at 632. It then extended that rule to the element of *mens rea. Id.* In other words, where two culpable mental states would satisfy the finding of guilt for one crime, the jury need not agree unanimously on the mental state. Apart from that, however, the plurality opinion of *Schad* is more an explanation of what the law is not, rather than what it is. As Justice Scalia noted in his concurrence, "the plurality approves the Arizona practice in the present case because it meets *one* of the conditions for constitutional validity. It does not say what the *other* conditions are, or why the Arizona practice meets them." *Id.* at 651.

Despite this, *Schad* has proven helpful in the past. For example, in *Brown,* we followed the Supreme Court in applying the rule that "[a] . . . jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." 553 S.W.3d at 839 (quoting *Richardson,* 526 U.S. at 817, citing *Schad,* 501 U.S. at 631-32). Applying that rule, we held that the jury did not have to agree which pieces of jewelry the defendant stole in one, singular act of robbery; only that the jury had to agree that movable property was taken. *Id.* at 840.

The case law in Kentucky most instructive on the issue of distinguishing between multiple acts and alternative theories is that which defines how to distinguish multiple acts from a continuous course of conduct. The difference between multiple, independent criminal acts and one continuous course of criminal conduct generally is "a sufficient break in the conduct and time so

that the acts constituted separate and distinct offenses." *Wellborn v. Commonwealth*, 157 S.W.3d 608, 612 (Ky. 2005). This break need only be "a cognizable lapse in his course of conduct during which the defendant could have reflected upon his conduct, if only momentarily, and formed the intent to commit additional acts." *Kiper v. Commonwealth*, 399 S.W.3d 736, 745 (Ky. 2012). These two cases illustrate the principle well. In *Wellborn*, the defendant shot a state trooper three separate times in three different areas of the body. All three shots were fired after a cognizable lapse in time occurred that allowed the defendant time to reflect upon his conduct. *Wellborn*, 157 S.W.3d at 611. In contrast, the defendant in *Kiper* shot one person in a drive-by shooting. But given the "rapid rate of the gunfire . . . the evidence does not support a reasonable conclusion that some of the shots were fired with the intent to wound while others were fired with the intent to kill." 399 S.W.3d at 746.

Though there is an obvious conceptual difference between "alternative theories" and a "continuous course of conduct," we fail to see why distinguishing multiple acts from the latter category is not applicable to distinguishing multiple acts from the former category. If there is a break in time and conduct that allows for the defendant, even momentarily, to pause and reflect, and form or reform intent to commit an additional act, then the Commonwealth has not presented two alternative theories for the perpetration of one crime; it has presented proof of two separate criminal acts.

Statutory law and case law does not support the argument that the two separate unlawful entries on each property in this case are merely brute facts

10

which make up a particular element of burglary in the third degree. *Cf. Brown*, 553 S.W.3d at 840. "A person is guilty of burglary in the third degree when, with the intent to commit a crime, he or she knowingly enters or remains unlawfully in a building." KRS 511.040(1). A building is defined as

> in addition to its ordinary meaning, means any structure, vehicle, watercraft or aircraft:
>
> (a) Where any person lives; or
> (b) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation.
>
> Each unit of a building consisting of two (2) or more units separately secured or occupied is a separate building.

KRS 511.010(1). The General Assembly's declaration that where there are two or more units in one building that are separately secured or occupied, then each unit constitutes a distinct building is obviously meant to facilitate multiple charges for burglary even when those units are attached to one another and physically constitute one structure. This is precisely what we ruled in *Ordway v. Commonwealth*, where the defendant burglarized nine different storage units at one storage facility, but the jury instructions did not differentiate between the individual units. 352 S.W.3d 584, 592-93 (Ky. 2011). It only stands to reason then that two separate physical structures which are in no way connected must also be considered two distinct buildings. In other words, unlawful entry into two separate buildings cannot be treated as a brute fact or merely presenting alternative means for one crime because the statute itself provides for treating both unlawful entries as separate crimes. It may be that prosecutorial discretion allows for the Commonwealth to not separately

11

charge each unlawful entry individually. But if that course is chosen, then the Commonwealth must steer away from introducing evidence regarding the uncharged unlawful entry.

In this case, Samantha Hall testified that she observed Johnson, at each property, enter multiple buildings—two greenhouses at the Dillihay property and a garage and barn at the Muhlenberg Alliance property. There is no argument that for either property the buildings were connected and not separately secured or occupied. Instead, the evidence shows they were distinct buildings and Johnson would obviously have had more than a momentary lapse of time while proceeding to the buildings to reflect on what he was doing and form a specific intention to unlawfully enter that particular building. We therefore hold that the instructions in this case were erroneous because the proof at trial demonstrated "two or more separate instances of a criminal offense[.]" *Johnson*, 405 S.W.3d at 449. "When that is the case, and the instruction does not specify which specific act it is meant to cover, we cannot be sure that the jurors were unanimous in concluding the defendant committed a single act satisfying the instruction." *Martin*, 456 S.W.3d at 7.

### B. No Palpable Error

Having concluded the instructions were erroneous we must now determine whether the error was palpable. Throughout our recent cases, a minority of this Court has consistently charged that we were weakening our standard for palpable review. In *Johnson*, it was Justice Cunningham, joined by Justice Scott, who concluded

12

> Our trial judges are being ambushed by such decisions as this one when we so lightly deem palpable error when the mistake has not been preserved. We are watering down our palpable error standard with holdings such as this to the point that it behooves the defense lawyer not to object on jury instructions and just allow the trial court to walk—unwarned—onto the unanimity land mine.

405 S.W.3d at 461 (Cunningham, J., concurring in part and dissenting in part). In *Ordway*, Justice Cunningham, also joined by Justice Scott, once again concluded no palpable error occurred "where there is sufficient evidence to convict a defendant on all of the identical instructions and the jury does, in fact, convict." 352 S.W.3d at 594 (Cunningham, J., concurring in part and dissenting in part). In *King v. Commonwealth*, 554 S.W.3d 343, 374-76 (Ky. 2018), Justice Keller addressed the issue. She was joined by Justices Cunningham and Wright in that opinion.

It is true enough that this Court has taken our palpable error standard of review to the limits when it comes to jury unanimity. For example, in *Martin* we wrote "that without regard for the probability of a different result an 'error so fundamental as to threaten a defendant's entitlement to due process of law' will also constitute manifest injustice under RCr 10.26." 456 S.W.3d at 8 (quoting *Martin v. Commonwealth*, 207 S.W.3d 1 (Ky. 2006)). Based upon *Johnson* and *Kingery v. Commonwealth*, 396 S.W.3d 824 (Ky. 2013), we held

> violation of the right to a unanimous verdict is reversible palpable error. To reach that conclusion, both cases relied solely on the substantial nature of the unanimous-verdict right coupled with the due-process impingement resulting from its violation. Nowhere in either case did this Court weigh the strength of the evidence or the probability of a different result.

13

*Id.* at 9. Indeed, we have even noted "that this Court has taken a minority view by regarding this instructional error, in certain instances, as structural error beyond the reach of harmless error or palpable error analysis." *King*, 554 S.W.3d at 355.

Last year, however, this Court ruled in *Sexton v. Commonwealth*, that "reversal is not the universal, essential result of a unanimous verdict error." 647 S.W.3d 227, 232 (Ky. 2022). In that case, "Sexton, through counsel, acknowledged guilt; the jury agreed that he was guilty of two counts each of rape and incest. Such an error, to the extent that it occurred, cannot have resulted in manifest injustice." *Id.* Such circumstances demonstrated "the necessity for cabining our precedent . . . [because] we cannot hold that any potential unanimity error would have resulted in a manifest injustice." *Id.* Beyond the fact-specific ruling of *Sexton*, there are two underlying principles that must be true for *Sexton* to have any validity—that jury unanimity errors are not structural errors and when unpreserved the correct standard of review is palpable error. We specifically distinguished *Sexton* from the holdings of *Martin* and *Johnson* in order to remove the effect of their precedential compulsion. We believe this case also provides another opportunity to cabin our precedent. Justice Cunningham spoke of trial courts being ambushed by the unanimity land mine. That proverbial land mine has, unfortunately, been laid by this very Court. Our decision today should be understood as clearing the minefield.

14

The error can be traced to *Martin v. Commonwealth*, 207 S.W.3d 1 (Ky. 2006). In that case we explained the defendant's burden under RCr 10.26—"the required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Id.* at 3. "To discover manifest injustice, a reviewing court must plumb the depths of the proceeding . . . to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* But a key misapplication of *Martin I*, as explained in *Martin II*,[3] is largely responsible for our Court's lax application of the palpable error standard in recent years. In *Martin II* we adopted the view that *Martin I* had "outlined a clear, dichotomous test allowing manifest injustice to be found in two distinct ways." 456 S.W.3d at 8. Elucidating further, we wrote

> First, we reaffirmed the then-prevailing palpable-error standard, acknowledging that manifest injustice may be found upon a showing of "a probability of a different result" absent the error. Second, the *Martin* court expanded the definition of palpable error by explaining that without regard for the probability of a different result an "error so fundamental as to threaten a defendant's entitlement to due process of law" will also constitute manifest injustice under RCr 10.26.

*Id.* (quoting *Martin I*, 207 S.W.3d at 3). A close reading of *Martin I*, however, does not support the conclusion that we created two classes of manifest injustice, one focusing on the probability of a different result and the other

---

[3] *Martin v.* Commonwealth, 207 S.W.3d 1 (Ky. 2006) and *Martin v. Commonwealth*, 456 S.W.3d 1 (Ky. 2015) did not share the same appellant. But the similitude of names can make it confusing to understand which case we refer to, so we adopt the distinction *Martin I* and *Martin II*, respectively, solely for purposes of clarifying our discussion.

15

focusing on a fundamental error threatening a defendant's right to due process.

What *Martin I* actually held was

> The language "[a] substantial possibility does not exist that the result would have been different" is *at best confusing,* and it *falls short of the required standard.* A better understanding is gained from an examination of RCr 10.26 with emphasis on the concept of "manifest injustice." While the language used is clear enough, we further explain that the required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law.

207 S.W.3d at 3 (emphasis added). While use of the disjunctive "or" supports *Martin II*'s understanding, the surrounding context does not. *Martin I* used the language of "fundamental error threatening a defendant's entitlement to due process of law" to explain and clarify the manifest injustice standard—an explanation deemed necessary because of ambiguity in the phrasing of a "substantial possibility of a different result." This is because the substantial possibility of a different result language "fails to adequately describe the necessary degree of prejudice associated with the unpreserved question in the context of the whole case." *Id.* Thus, *Martin I* clarified the manifest injustice standard. *Martin I*'s further comments on the palpable error standard only spoke of it in the singular, and not as two distinct categories. "When an appellate court engages in *a* palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5 (Emphasis added). Or "[a] claim of palpable error presupposes a lack of preservation and such claims are held to *the standard* described herein." *Id.*

16

(Emphasis added). It is strange indeed that having found the language "substantial possibility of a different result" wanting, the Court would seek a curative by creating an entirely separate class of palpable errors that have even less evidentiary rigor than the original standard. After a properly contextualized understanding of *Martin I*, we can conclude that the Court was only seeking to clarify the singular manifest injustice standard in RCr 10.26; not create an entirely new category of palpable error.

As stated before, *Martin II* relied on our holdings in *Johnson* and *Kingery. Kingery* does say "the right to a unanimous verdict is a substantial right; the violation of which we have held requires reversal." 396 S.W.3d 824, 831-32 (Ky. 2013). But *Kingery* cited to *Miller v. Commonwealth*, 283 S.W.3d 690, 696 (Ky. 2009) for that statement. *Miller*, however, in concluding palpable error existed, stated "that is not to say that every error in jury instructions rises to the level of palpable error." *Id.* at 696. Instead, prejudice is presumed, and the Commonwealth may rebut that presumption to show no prejudice resulted from the error. *Id.* Nonetheless, *Johnson* and *Kingery* have been read to support the proposition that all that is necessary to reverse on a jury unanimity issue is "the substantial nature of the unanimous-verdict right coupled with the due-process impingement resulting from its violation." *Martin II*, 456 S.W.3d at 9. And *Martin II* clearly held that "even in light of overwhelming evidence of guilt" the law still compelled reversal under that standard. *Id.* Such a review eschews any consideration of "the strength of the evidence or the probability of a different result," and "the factual idiosyncrasies contemplated as part of the

17

palpable-error analysis." *Id.* Thus, despite ostensibly applying a palpable error standard of review, we frankly admitted in *King* that such a review treats "this instructional error, in certain instances, as structural error . . ." 554 S.W.3d at 355.

At this point, it is worth noting that the federal appellate courts do not consider jury unanimity errors as structural errors. *United States v. Newell*, 658 F.3d 1, 28 (1st Cir. 2011) ("Although we have concluded that the failure to provide a specific unanimity instruction was error and violated the appellants' right to a unanimous jury verdict, this alone is not sufficient to satisfy the rigors of plain error review."); *United States v. Gaddy*, 174 Fed.App'x. 123, 125 (3rd Cir. 2006) (unpreserved error for failure to give specific unanimity instruction reviewed for plain error); *United States v. Tragas*, 727 F.3d 610, 616-17 (6th Cir. 2013) (assuming a jury instruction was erroneous for duplicity and the error was plain, yet holding defendant could not satisfy third prong of plain error analysis, "that the error affected her substantial rights"); *United States v. Arreola*, 465 F.3d 1153, 1161 (9th Cir. 2006) ("Where a defendant fails to object to an indictment as duplicitous before trial and fails to object to the court's jury instructions at trial, we review for plain error[.]"); *United States v. Deason*, 965 F.3d 1252, 1269 (11th Cir. 2020) (unpreserved error for failure to give an unanimity instruction to cure duplicitous indictment subject to plain error analysis). Federal appellate cases are only persuasive authority but given the Supreme Court has incorporated the unanimous jury requirement to the states under the federal constitution, there is a strong incentive to align

18

Kentucky law with the federal circuits.[4] And because we can trace our misalignment to a misreading of *Martin I*, there is an additional incentive to a correct course. *See Beaumont v. Zeru*, 460 S.W.3d 904, 909 (Ky. 2015) ("The doctrine of *stare decisis* does not commit us to the sanctification of ancient or relatively recent fallacy.") (internal quotation omitted). In fact, *Martin I* held "the plain error test of Federal Rule of Criminal Procedure 52(b), [is] the federal counterpart of RCr 10.26." 207 S.W.3d at 3. And despite linguistic differences between FRCP 52(b) and RCr 10.26, *Martin I* further declared the Supreme Court's explanation of FRCP 52(b) in *United States v. Cotton*, 535 U.S. 625, 631-634 (2002), to be "a valuable guide in the application of our palpable error rule." *Id.* at 4.

What *Sexton* implicitly began, we now explicitly finish. There is no separate category of palpable error review for "errors so fundamental as to threaten a defendant's entitlement to due process of law." *Martin I*, 207 S.W.3d at 3. Instead, that language is an explanation as to the "degree of prejudice" that must be demonstrated in order for a court to determine there is a "substantial possibility" a different result would have resulted but for the unpreserved error. *Id.* In all cases presenting an unpreserved error regarding a unanimous jury, the courts must "plumb the depths of the proceeding" and scrutinize the factual idiosyncrasies of the individual case. *Id.* That includes a

---

[4] We emphasize this is an incentive only—"neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation." *Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring).

consideration of the weight of the evidence. Only if, upon review, a court can conclude "the error is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process," will reversal be warranted. *Id.* at 5. ""It should be so egregious that it jumps off the page … and cries out for relief." *Chavies v. Commonwealth*, 374 S.W.3d 313, 323 (Ky. 2012) (quoting *Alford v. Commonwealth*, 338 S.W.3d 240, 251 (Ky. 2011) (Cunningham, J., concurring)). To the extent that *Johnson, Kingery, Martin II*, and *King*, can be read to the contrary they are overruled.

Having settled what the law is, we may now consider the facts of Johnson's case. Instruction No. 1 given to the jury reads,

> You will find the Defendant guilty of Burglary in the Third-Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about January 12, 2021, and before the finding of the Indicitment herein, he entered or remained in a building owned by Kenneth Dillihay without the permission of Kenneth Dillihay or any other person authorized to give such permission;
>
> AND
>
> B. That in so doing, he knew he did not have such permission;
>
> AND
>
> C. That he did so with the intention of committing a crime therein.

Instruction No. 3 is identical with the exception of Part A, which reads,

> A. That in this county on or about January 18, 2021, and before the finding of the Indictment herein, he entered or remained in a building owned by the Muhlenberg Alliance for Progress, Inc. without the permission of the Muhlenberg Alliance for Progress, Inc. or any other person authorized to give such permission;

20

This was a one-day trial and the evidence presented to prove these crimes was straight-forward and simple. Johnson had an ankle-monitor attached to his person and the GPS logs showed that Johnson was at the properties on the respective dates mentioned in the instructions. Several tools and other equipment from the Dillihay property were taken, including a miter saw. Samantha Hall testified that she and Johnson drove to his mother's residence and left the items there. Law enforcement subsequently recovered the miter saw from his mother's residence. Finally, Hall's testimony was that she drove Johnson to the respective properties on the dates described in the instructions. She testified she saw Johnson enter buildings to take tools and specifically that he entered a greenhouse on the Dillihay property. She also sent a photograph of said tools lying in the trunk of her car to a Sheriff's Deputy while she and Johnson were on the Dillihay property to inform him of the thefts. She testified those tools in the photograph were taken from the greenhouse. Mr. Dillihay testified that all the items stolen were located in the high-tunnel greenhouse. For the Muhlenberg Alliance property, Hall testified that she once again drove Johnson to the property and observed him enter multiple buildings, leaving one building with gas jugs and another building with milk cans. Trail camera photos from the Muhlenberg Alliance property from January 18 showed Johnson stealing gas jugs. Those gas jugs were subsequently recovered by law enforcement at Johnson's residence.

After reviewing this evidence, we conclude the instructional error here is not "so manifest, fundamental and unambiguous that it threatens the integrity

of the judicial process." *Martin I*, 207 S.W.3d at 5. Johnson was well aware of the charges against him and the underlying facts that predicated those charges. There is hardly any chance this evidence was confusing to the jury. The GPS location evidence irrefutably placing Johnson at the properties on the dates in question; the testimony of Hall that she saw Johnson enter buildings on the properties on the dates in question; and the photographic and physical evidence of items taken from the property and subsequently recovered either at Johnson's residence or his mother's residence; and the fact that none of this evidence is confusing nor complex, combine such that we cannot say that but for the instructional error, there is a substantial possibility of a different result. Therefore, there was no palpable error.

### C. Penalty Phase Errors

Johnson alleges two errors that occurred during the penalty phase of the trial. First, that Camron Laycock, the Circuit Court Clerk for Muhlenberg County, testified about eight prior felony convictions for Johnson. One of these was an indictment of theft by unlawful taking over $300 in 2007. That charge, however, was amended to unauthorized use of a motor vehicle at the time of conviction, typically a misdemeanor.[5] The Order on A Plea of Guilty in that case, included in Johnson's briefing because of an apparent error in not

---

[5] The pertinent statute reads, "Unauthorized use of an automobile or other propelled vehicle is a Class A misdemeanor unless the defendant has previously been convicted of this offense, or of violation of KRS 514.030 for having stolen an automobile or other propelled vehicle in which case it shall be a Class D felony." KRS 514.100(2).

22

making the document a part of the trial record, shows that Johnson's plea of guilty was as a Class A misdemeanor. Parole Office Fouse also testified about Johnson's probation and parole history, testifying to a litany of parole violations and "charges." Johnson identifies three instances of erroneous testimony: (1) that he was charged with fleeing or evading the police, wanton endangerment, and reckless driving but no mention subsequently of no indictment returned on the wanton endangerment charge and the dismissal of the reckless driving charge; (2) charged with first degree burglary but no mention that it was subsequently amended to first degree criminal trespass; and (3) charged and convicted with theft by unlawful taking "disposition or auto", and operating a motor vehicle under the influence of alcohol or drugs, aggravated third offense, with no mention that the actual conviction was for attempted theft by unlawful taking of an automobile and operating a motor vehicle under the influence of alcohol or drugs, aggravated, third offense.

The Commonwealth has not argued for any of the above instances that the testimony was in fact accurate. Under that circumstance, we have clearly held, "[n]othing in KRS 532.055(2)(a) permits a jury to hear evidence during the penalty phase of prior charges that have been amended . . . ." *Blane v. Commonwealth*, 364 S.W.3d 140, 152 (Ky. 2012), *abrogated on other grounds by Roe v. Commonwealth*, 493 S.W.3d 814, 828 (Ky. 2015). "[I]t is also well settled that the Commonwealth cannot introduce evidence of charges that have been dismissed or set aside." *Id.* (quoting *Cook v. Commonwealth*, 129 S.W.3d 351, 365 (Ky. 2004)). Additionally, prior uncharged acts of misconduct are not

23

admissible in the penalty phase. *Foster v. Commonwealth,* 827 S.W.2d 670 (Ky. 1991). But parole violations are admissible in the penalty phase. *Garrison v. Commonwealth,* 338 S.W.3d 257, 260-61 (Ky. 2011).

In *Blane,* we found the introduction of amended or dismissed charges to be palpable error because "the Commonwealth not only elicited the testimony from the deputy circuit clerk regarding the original charges, but it also emphasized the prior amended charges in its closing argument to the jury." *Id.* Moreover, "Appellant received the maximum penalty on all counts for which he was convicted." *Id.* But we have not found palpable error where the maximum sentence was not given and "the dismissed and amended offenses were never pointed out to the jury by the trial judge, the Commonwealth, or the Commonwealth's witness." *Chavies v. Commonwealth,* 354 S.W.3d 103, 115 (Ky. 2011). We have also not found palpable error when, despite the maximum sentence being given, "[i]n contrast to *Blane,* where there was testimonial or argumentative reference to the originally charged, but later dismissed or amended, offenses, in this case there is only the *possibility* that the jurors might have gleaned that information if they looked at the judgments during their deliberations." *Martin v. Commonwealth,* 409 S.W.3d 340, 349 (Ky. 2013). Finally, we have not found palpable error when evidence of prior uncharged acts of misconduct was admitted but this was outweighed by "evidence of Miller's three prior convictions on six counts of trafficking in a controlled substance in the first degree, the fact that he had been granted and violated parole on three separate occasions and evidence that he continued his illegal

24

drug activity each time he was released on parole." *Miller v. Commonwealth*, 394 S.W.3d 402, 408 (Ky. 2011).

Here Johnson received the maximum sentence and direct testimony from Laycock and Fouse was elicited regarding the erroneous and inaccurate charges. The Commonwealth argues that *Martin* should be controlling because that case distinguished *Blane* on account of the Commonwealth in *Blane* emphasizing the erroneous charges in its closing argument. *Id.* at 348. In this case though the Commonwealth did mention the 2007 conviction falsely portrayed as a felony, along with the other accurately portrayed felony convictions. The Commonwealth explicitly argued to the jury that "the time for mercy is past" after reciting this history. Moreover, the dispositive factor in *Martin* was not Commonwealth's closing argument but rather that "the clerk testified *only* to the actual charges for which a conviction was adjudged. There was no mention of any dismissed charges or of the originally-charged higher offenses that were amended to lesser offenses resulting in convictions." *Id.* at 348. Consequently, we were "unable to ascertain from our review of the record whether the jury actually saw the improper evidence; Appellant cites us to no evidence that the exhibits went with the jury to the deliberation room, and our viewing of the video record reveals none." *Id.* But the decision of *Miller* that inadmissible evidence can be outweighed by otherwise admissible evidence precluding a finding of palpable error puts Johnson's case in an awkward grey zone. There is no doubt that there were several other qualifying felonies the

25

jury might have relied upon to determine Johnson is a persistent felony offender.

The dispositive factor, the one which moves Johnson's case out of the grey zone, is the inclusion of the 2007 conviction in Instruction No. 3 of the penalty phase as a qualifying felony offense. In *Carver v. Commonwealth*, we reversed a first-degree PFO conviction because a misdemeanor charge was listed in the instructions as a qualifying felony conviction. We stated

> We believe that palpable error occurred because of (1) the improper inclusion of a misdemeanor as a qualifying conviction in the PFO instruction; (2) our presumption that erroneous jury instructions are prejudicial, *Harp v. Commonwealth,* 266 S.W.3d 813, 818 (Ky.2008); and (3) the fact that Carver was assessed the maximum possible penalty.

303 S.W.3d 110, 123 (Ky. 2010). Thus, because Johnson did receive the maximum sentence; and there was direct testimony elicited from two persons regarding four charges which either had been amended or dismissed prior to final disposition; and the Commonwealth did mention the 2007 conviction erroneously portrayed as a felony conviction to argue to the jury during the penalty phase that "the time for mercy is past"; and, finally, because of the erroneous inclusion of the misdemeanor conviction on the jury instruction as a qualifying felony conviction, we hold there was palpable error. Therefore, we vacate the conviction as a persistent felony offender and remand the case for a new penalty phase with instructions that indictments or charges for felonious crimes that were subsequently amended to misdemeanors or dismissed not be mentioned, and specifically that the 2007 conviction in Muhlenberg Circuit

Court for unauthorized use of a motor vehicle is not a qualifying felony conviction.[6]

### D. Greenhouse is a Building

Finally, Johnson argues the trial court erred when it failed to give a directed verdict on the third-degree burglary charge pertaining to Dilliahy's greenhouse. Johnson argues the greenhouse does not qualify as a building under the statute because the "high tunnel" greenhouse is typically, in agricultural pursuits, only a temporary structure. Additionally, he cites the dilapidated state of the greenhouse because most of its plastic sheeting over the roof and walls was missing. Dillihay testified, and Johnson concedes, the greenhouse at the time of the burglary was being used "to store either livestock or a variety of farm-related implements."

The standard of review on appeal of a denial for a motion for directed verdict is well-established—"the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Eversole v. Commonwealth*, 600 S.W.3d 209, 217-18 (Ky. 2020). The interpretation of statutes is a legal question reviewed *de novo. Commonwealth v. Love*, 334 S.W.3d 92, 93 (Ky. 2011).

---

[6] As a consequence of our decision, we do not think it necessary to consider Johnson's second allegation of error in the penalty phase that the Commonwealth elicited false or misleading testimony regarding good time credits and Johnson's eligibility for parole should he receive a maximum sentence, enhanced by a persistent felony offender conviction.

This argument is controlled by our ruling in *Soto v. Commonwealth*, 139 S.W.3d 827, 870 (Ky. 2004). We held the "ordinary meaning" of a building per KRS 511.010(1) is

> A constructed edifice designed to stand more or less permanently, covering a space of land, usually covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, *storehouse,* factory, shelter for animals *or other useful structure*—distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy.

*Id.* (quoting *Webster's Third New International Dictionary of the English Language Unabridged* 292 (Merriam–Webster 1993)). We further reiterated that the "statute applies to every structure that meets the definition of a building as used in common parlance, without regard to whether it is inhabited or inhabitable." *Id.* (quoting *Funk v. Commonwealth,* 842 S.W.2d 476, 482–83 (Ky. 1992)).

Dillihay testified that the greenhouse had been standing for approximately five years, thus it was "more or less" permanent. It was being used to store farm tools and house goats; thus, it was a "storehouse" and a "shelter for animals." Although the photographic evidence does show that the plastic covering of the greenhouse was significantly missing, and we may presume was not particularly effective at storing the tools or sheltering the animals from the natural elements, we do not think that is a dispositive factor. Habitability is not a factor in determining whether a structure is a building. *Id.* The uncontroverted evidence was that the greenhouse had been standing for approximately five years and tools were being stored in the greenhouse, as well

28

as goats. It was a more or less permanent structure currently in use, however ineffective, as a storehouse and shelter for animals. The motion for directed verdict was properly denied.

### III. Conclusion

For the aforementioned reasons, we affirm Johnson's convictions for burglary in the third degree. We reverse his conviction as a persistent felony offender. We remand to the Muhlenberg Circuit Court to conduct a new penalty phase trial.

All sitting. VanMeter, C.J.; Bisig, Lambert, and Nickell, JJ., concur. Keller, J., concurs in part and concurs in result only in part, by separate opinion in which Thompson, J., joins.

KELLER, J., CONCURRING IN PART AND CONCURRING IN RESULT ONLY IN PART: I wholeheartedly concur with the Majority's well-written Opinion that the alleged unanimity violation in this case does not rise to the level of palpable error. For years, a majority of this Court had "continue[d] to weaken the palpable error analysis" when it came to unanimity violations. *King v. Commonwealth*, 554 S.W.3d 343, 366 (Ky. 2018) (Keller, J., concurring in part and dissenting in part). The Majority has put an end to that today, and with that holding I am in full agreement. I concur with the Majority's decision to overrule, at least in part, *Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013), *Kingrey v. Commonwealth*, 396 S.W.3d 824 (Ky. 2013), *Martin v. Commonwealth*, 456 S.W.3d 1 (Ky. 2015), and *King*, 554 S.W.3d 343. It is a

29

decision which I have long awaited and for which I have spilled much ink advocating.

However, I write separately because, consistent with my oft-stated position, I do not believe that the instructions given to the jury in this case present a unanimity violation. *See Justice v. Commonwealth*, 636 S.W.3d 407, 420–21 (Ky. 2021) (Keller, J., concurring in part and dissenting in part); *King*, 554 S.W.3d at 365–74 (Keller, J., concurring in part and dissenting in part); *Gartin v. Commonwealth*, No. 2019-SC-0628-MR, 2021 WL 1133625, *4–5 (Ky. Mar. 25, 2021) (Keller, J., dissenting in part and concurring in result only in part). As Justice Cunningham stated in his dissent in part in *Johnson v. Commonwealth*, the Majority of this Court is "requiring juries to be unanimous on matters that the unanimous verdict requirement never anticipated." 405 S.W.3d at 461 (Cunningham, J., concurring in part and dissenting in part).

Thompson, J., joins.

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Jenna M. Lorence
Assistant Solicitor General

Bryan D. Morrow
Assistant Attorney General